619 P.2d 836

Arthur GALLEGOS, Plaintiff–Appellant,

v.

**LOS LUNAS CONSOLIDATED SCHOOLS BOARD OF EDUCATION and Jose U. Otero, Ismael S. Gurule, Fidel Aragon, Elfego Orona, Fred Luna, in their official capacities as members of the Board of Education of Los Lunas Consolidated Schools and A. H. Ruybalid, Superintendent of Los Lunas Schools, Defendants–Appellees.**

No. 4427.

Court of Appeals of New Mexico.

Aug. 14, 1980.

John W. Pope, Pope & Apodaca, Belen, for plaintiff–appellant.

Edward J. Apodaca, Albuquerque, for defendants–appellees.

## OPINION

ANDREWS, Judge.

In this action, Arthur Gallegos, a non–certified school employee, brought suit against members of the Los Lunas Consolidated Schools Board of Education and its superintendent in their official capacities. He alleged that he had been terminated without due process of law, and in violation of § 22–5–4, N.M.S.A.1978.[1] The trial court determined that there existed no genuine issue of material fact, and granted a summary judgment for the defendants.

Summary judgment is a drastic action, for it forecloses any further proof in a matter–thus, a party opposing such a motion is entitled to have all reasonable inferences afforded him. *Barber's Super Markets, Inc. v. Stryker*, 81 N.M. 227, 465 P.2d 284 (1970). Summary judgment should only be entered when there is no genuine issue of fact to be determined by the factfinder. The burden was on defendants to show an absence of a genuine issue of fact, or that they were entitled as a matter of law for some other reason to a summary judgment in their favor. *Goodman v. Brock*, 83 N.M. 789, 498 P.2d 676 (1972); but cf.: *Fischer v. Mascarenas*, 93 N.M. 199, 598 P.2d 1159 (1979), where the Supreme Court relies on the "slightest doubt" test with reference to a summary judgment. Section 22–5–4 establishes the power and delineates the duties of local school boards. The provision provides local school boards with the power to delegate administrative and supervisory functions to the superintendent of schools; however, the law also requires that such boards must approve or disapprove the employment or discharge of "*all* employees and certified school personnel . . . ." (Emphasis added.)

The statute is explicit. It speaks of a *recommendation* by the superintendent of schools, and *action* by the Board. This is a critical distinction. Since the Board acts as a body, and because its decisions as to terminations are carried out "subject to the provisions of law," the employee has a right to have this public body consider and discuss a proposed termination prior to the action. Any other interpretation of this section would deny an employee the right to a prior determination by a majority of an elected forum.

Thus, we must consider whether the plaintiff in the instant action was afforded the rights guaranteed under the statute; if he (1) was terminated without a prior deter-

1. 22–5–4. Local school boards; powers, duties.

A local school board shall have the following powers of duties.

A. subject to the regulations of the state board, supervise and control all public schools within the school district, and all property belonging to or in the possession of the school district;

B. employ a superintendent of schools for the school district and fix his salary;

C. delegate administrative and supervisory functions of the local school board to the superintendent of schools;

D. subject to the provisions of law, approve or disapprove the employment or discharge of all employees and certified school personnel of the school district upon a recommendation of employment or discharge by the superintendent of schools;

\*  \*  \*  \*  \*  \*

mination of the Board, and (2) was either an "employee" or "certified school personnel of the school district," he has met the statutory requirements for a cause of action. Further, we need only decide "reasonable doubts" exist as to these elements. *Goodman v. Brock, supra.*

The facts presented here show that on March 6, 1979, A. H. Ruybalid (the Superintendent of the defendant district) gave a letter of dismissal to Gallegos, a permanent custodian employed by the district since October, 1978. Although the Gallegos dismissal had been discussed with members of the school board prior to the date the letter was delivered, the Board did not approve the dismissal until a closed meeting held July 10, 1979. Later that same day, the Board reaffirmed and ratified its action in an open meeting.

The minutes of the July 10 Board meeting reflect that the second item on the agenda was to "[a]ffirm actions taken by the Superintendent during meeting of March 13, on the dismissal of Arthur Gallegos on 3/6/79." Later in the minutes, the following explanation for the procedure is offered:

[I]t was on the agenda of March 13, 1979, but he [Ruybalid] recommended it be deleted as he felt it was an administrative matter and could be handled administratively.

As stated above, the statute requires that a local school board "... approve the ... discharge" of all employees. The school board did not do so here. Rather, the Superintendent acted without the prior approval of the Board. Under § 22–5–4(D), the Superintendent has only the power to recommend a termination. If the Legislature had intended to provide the Superintendent with broader authority, it would have so stated. *See Burroughs v. Board of County Commissioners*, 88 N.M. 303, 540 P.2d 233; *Martinez v. Research Park*, 75 N.M. 672, 410 P.2d 200. In 1979, this portion of the statute was amended to require that any termination or discharge of an employee by a local school board without the prior recommendation of the superin-

tendent is void. The Board argues that this amendment "strengthened the power of the superintendent" in regard to the termination of employees. While this is true, the amended provision still requires that the local board approve the discharge of an employee and the new language when compared with the original provides a clear guide to the legislative intent of the statute. The new sections, while not in effect at the time relevant to this action, anticipates that the Board will effect the actual termination. It is apparent, therefore, that Gallegos was terminated without prior approval of the Board, and that there is quite a bit more than "reasonable doubt" as to this point. Since there is uncontroverted testimony that plaintiff was an "employee", it is clear that both elements of this cause of action were supported by sufficient evidence to raise reasonable doubts.

Certainly there exists evidence which suggest that the Board had previously heard of the desire of Mr. Ruybalid to terminate the plaintiff. There is even evidence which suggests that the Board may have given Ruybalid authority to terminate. This evidence is, however, controverted both by the statements quoted above, and by other evidence. There was the Superintendent's belief that "[t]he superintendent has the authority to dismiss employees–to do many things." Also, in response to the question of whether plaintiff's termination had ever been discussed with the Board, the Superintendent responded:

[Y]ou don't have the discussion necessarily at Board meetings, ... [w]orkshops that ... did not have to be open to the public.

Most important was his statement that there had been "no vote. Just a discussion."

Q. Was there a vote that gave you authority to handle it in the best way you knew how?

A. No, just general discussion and in fact–see, we had been having problems with Arthur Gallegos prior to the March meeting.

\*    \*    \*    \*    \*    \*

Q. O. K. But, there had never been a vote up until that (July 1979) time, is that correct?

A. Not at an open meeting, no.

The alleged authority was in the form of a discussion of a general nature, and had never actually been by vote. We need not reach the question of whether a Board action taken covertly would violate the obvious due process rights an open Board meeting might protect—for, the Board never actually granted any authority to the Superintendent. The issue of whether the actions were taken in an open or closed meeting is, therefore, largely irrelevant.[2]

As noted above, this evidence—when read in a light most favorable to Mr. Gallegos—creates a factual question which must be submitted to the jury before the ultimate legal issues can be resolved. *See Pribble v. Aetna Life Ins. Co.*, 84 N.M. 211, 501 P.2d 255 (1972), where the court found that where a genuine issue of material fact existed as to the authority of an agent, a summary judgment was inappropriate.

The summary judgment is reversed and the trial court is directed to reinstate the cause on its docket for further proceedings consistent with this opinion.

IT IS SO ORDERED.

WOOD, C. J., dissenting.

SUTIN, J., specially concurring.

WOOD, Chief Judge (dissenting).

It is undisputed that the Superintendent terminated plaintiff on March 6, 1979. Section 22–5–4(D), N.M.S.A.1978 required the School Board to approve the discharge. Plaintiff contends this approval did not occur until July 10, 1979 and, therefore, he is entitled to his salary from March 6 to July 10, 1979.

The affidavit of the President of the School Board is that the School Board and the Superintendent discussed plaintiff's substandard work performance in meetings

of January and February, 1979 and "during a meeting in February 1979, he and the other members of the BOARD informed the Superintendent of the BOARD'S approval of the termination of ... [plaintiff's] employment ... whenever, in the judgment of the Superintendent, ... [plaintiff's] performance deteriorated to the extent that the Superintendent considered summary termination ... advisable prior to the next scheduled meeting of the BOARD ...." The affidavit continues: "That delegation of this specific administrative function to the Superintendent was considered necessary and proper by the BOARD in light of continuing reports" concerning plaintiff.

When the answers given by the Superintendent in his deposition are considered in context, I find nothing contradicting the affidavit of the School Board President. The nonpublic meeting of the School Board on March 13, 1979 and the public meeting of the School Board on July 10, 1979 do not change the undisputed fact that plaintiff was discharged on March 6, 1979 pursuant to an approval of the Board, given to the Superintendent in February, 1979.

Plaintiff sought a continuance of the summary judgment hearing "until such time as we have better notice to prepare." Denial of the motion for continuance was not error. The record of the summary judgment hearing shows that plaintiff was prepared on the legal issues and that no claim was made that time was needed to develop anything factual.

I would affirm the summary judgment.

SUTIN, Judge (specially concurring).

I concur in the result.

The rules applicable to summary judgment have been restated many times. Generally speaking, they appear to be convenient vehicles used in the disposition of litigation. To repeat the admonition that "Summary Judgments are drastic remedies to be used with great caution" will not

2. Neither do we find issues as to the "personal matter" exclusion of the Open Meeting Law (§ 10–15–1, N.M.S.A.1978) applicable, since

this provision became effective after the letter of dismissal which is the subject of this case.

deter their use. It is a tautologous statement that has lost its vitality.

*First*, we are confronted with the discharge of plaintiff, a public school employee, by the superintendent of schools of a district that is under the supervision and control of Los Lunas Consolidated Schools Board of Education.

The only reference to discharge of an employee is found in § 22–5–4(D), N.M.S.A. 1978. It reads in pertinent part:

A local school board shall have the following powers or duties:

\* \* \* \* \* \*

D. subject to the provisions of law, approve ... the ... discharge of all employees ... upon a recommendation of ... discharge by the superintendent of schools.

This provision does not provide for discharge of employees by the board or the superintendent. It permitted the superintendent to recommend a discharge to the board. If, by some unknown way, a discharge is effected, the board can "approve ... the ... discharge." To "approve a discharge," anticipates a discharge of an employee. No provision was made in subsection (D) for the board, the superintendent or anyone else to discharge a school employee. To make this provision effective, we should have to delete "approve ... the ... discharge of all employees," and substitute therefore, "may discharge all employees," upon the recommendation of the superintendent. This amendment is a legislative, not a judicial, function. Subsection (D) is invalid.

Subsection (A) provides that subject to the regulations of the state board, the local school board shall have the power or duty to "supervise and control all public schools within the school district ....", and subsection (C) provides that the board shall "delegate administrative and supervisory functions of the local school board to the superintendent of schools." "Control," however, remains with the local board. Subsection (A) grants the school board the right to discharge employees.

Page 12 of the Policy Handbook of the board sets forth the duties of the superintendent. Section 3(C) reads in pertinent part:

make recommendations to the Board on all official district business, including ... dismissal ... of ... staff.

"The word 'staff' connotes a body of assistance carrying out the will of a superior." *Beta Nu Chapter, Delta Sigma Theta Sorority v. Smith*, 120 Ind.App. 95, 89 N.E.2d 722 (1950). This may be explained in *Davis v. Traub*, 90 N.M. 498, 565 P.2d 1015 (1977). *Davis* held that "staff" in the context of a district attorney or attorney general refers to the legal staff of the district or attorney general, e. g., assistant district attorney or assistant attorney general.

Plaintiff, a janitor who worked in public schools was not a staff assistant of the superintendent of schools. This provision did authorize the superintendent to make recommendations but not to discharge plaintiff.

On March 6, 1979, the superintendent notified plaintiff in writing that his employment was "terminated as custodian for the Los Lunas Schools effective immediately."

The superintendent testified that the letter was written under his authority as superintendent; that the superintendent has authority to dismiss employees; that on March 9, three days later, he enclosed a copy of the letter to the board to be discussed before the meeting on March 13. The subject was discussed before the meeting but it was deleted from the agenda. An official vote of the board to approve the superintendent's dismissal of plaintiff was taken at the board meeting on July 10, 1979. This was the only vote taken by the board at an open meeting.

The board claims that it delegated authority to the superintendent to discharge plaintiff.

The affidavit of the president of the board said:

That during a meeting in February 1979 ... the BOARD informed the Superintendent of the BOARD's approval of

the termination of ARTHUR GALLE-GOS' employment ... whenever, in the judgment of the Superintendent, ARTHUR GALLEGOS' performance deteriorated to the extent that the Superintendent considered summary termination of ARTHUR GALLEGOS' services advisable prior to the next scheduled meeting of the BOARD ....

The minutes of the February, 1979, board meeting are not of record.

The superintendent was asked these questions to which he gave these answers:

Q. Was there a vote taken at the work shop to dismiss Mr. Gallegos?

A. No vote. Just a discussion.

Q. O. K. And—

A. And they gave me the authority to handle it in the best way I knew how.

Q. Was there a ·vote taken that gave you authority to handle it in the best way you knew how?

A. No, just general discussion ....

A general discussion held by a local board of education does not constitute official action. The record discloses no dispute in the evidence and the facts. The board failed to make a prima facie showing that it was entitled to summary judgment. It established plaintiff's claim for wages as a matter of law.

Plaintiff is entitled to recover compensation from March 6, 1979 to July 10, 1979, as a matter of law.

*Second*, plaintiff claims that the failure of the school board to formally act on his dismissal was a violation of due process rights. I agree.

Plaintiff was employed as a substitute custodian for the school system in February 1978, and then hired permanently in October of 1978. The board summarily dismissed plaintiff, a permanent employee, without notice or hearing, with no standard of "cause" for discharge, nor any right of appeal. In sum, plaintiff had no·job protection rights.

Procedural due process means many different things in the numerous contexts in which it applies.

Although we cannot define "due process of law" as used in the Fourteenth Amendment of the United States Constitution and Art. II, § 18 of the New Mexico Constitution, its essential prerequisites procedurally are clear and unmistakable. When the Constitution says: "No person shall be deprived of life, liberty or property without due process of law," it means "that there shall be a regular course of proceedings in which notice is given of the claim asserted and an opportunity offered to defend against it." *Simon v. Craft,* 182 U.S. 427, 437, 21 S.Ct. 836, 840, 45 L.Ed. 1165 (1901). Stated succinctly, "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363, 1369 (1914); *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970); *Matter of Protest of Miller,* 88 N.M. 492, 542 P.2d 1182 (Ct.App.1975); *Wollen v. State,* 86 N.M. 1, 518 P.2d 960 (1974).

This fundamental rule is applicable to persons engaged in public employment. Summary dismissal from public employment without hearing or inquiry violates due process. *Slochower v. Board of Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); *Connell v. Higginbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971). "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure." *Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915).

A distinction has been drawn between a person who seeks a renewal of public employment and one who has been discharged. In the former, the person is not deprived of a protected interest. Due process is not denied where no reasons are given for failure to renew the employment nor opportunity to challenge it at any sort of hearing. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). *Perry v.*

*Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

In the latter, where one has been discharged, no more direct assault on a person's freedom can be imagined than to allow school authorities to discharge an employee without a timely and adequate notice and hearing. The reasons for a proposed termination must be explicitly stated, and an effective opportunity given to defend by confronting adverse witnesses and presenting one's own case. These rights are important. Due process requires an opportunity to confront and cross–examine adverse witnesses. But, see, *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). When governmental action seriously injures an employee and the reasonableness of the action is an issue, the government must disclose its case to the employee so that he has an opportunity to show that it is untrue. Procedural due process is our fundamental guarantee of fairness, our protection against arbitrary, capricious, and unreasonable government action.

In 1976, the Supreme Court of the United States did a rightaboutface in *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Bishop was a probationary policeman. After six months he became a permanent employee. He was dismissed under a city ordinance that allowed discharge without a hearing for failure to properly perform his duties. The majority opinion followed state law. Following language in *Roth, supra,* that a person remains free as before to seek other employment, the court said:

> . . . The same conclusion applies to the discharge of a public employee whose position is terminable at the will of the employer when there is no public disclosure of the reasons for the discharge.
>
> \*   \*   \*   \*   \*   \*
>
> *The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies.* We must accept the harsh fact that numerous individual mistakes are inevitable in the day–to–day administration of our affairs. . . . [426 U.S. 348–350, 96 S.Ct. 2079–2080.]

See, Annot. *Termination of Public Employment: Right to Hearing Under Due Process Clause of Fifth or Fourteenth Amendment–Supreme Court Cases,* 48 L.Ed.2d 996 (1977). In effect, the majority opinion has, by judicial rule, returned public employment to early law and to the status of private employment with reference to employees whose positions are terminable at the will of the employer. Notes–*The Due Process Rights of Public Employees,* 50 N.Y.U.L.Rev. 310 (1975), a historical and perspective view of the law. Although not discussed in the opinion, query–is the Fourteenth Amendment now inapplicable to public as well as private employment? For a history of the development of federal civil service reform, see *Arnett, supra.*

*Bishop* found a simple solution to the perplexing problem of "review of the multitude personnel decisions" that flow from a fast growing nation. It dropped the protection of due process in federal courts. This rule is not applicable to the states. Adherence to the former rule now compels legislative action to preserve the strength of the Fourteenth Amendment. Heretofore, absent legislative action, the Supreme Court extended the meaning of due process to meet the vast expansion of personnel problems. The requirements of summary procedures, rather than abolition of job protection rights, would better serve the needs of public employees today in a constitutional sense.

It has been argued by government that to provide procedural due process to all public employees would place an intolerable burden on the machinery of government; that to require notice, a statement of reasons and a hearing are useless acts because a government bent on denying employment to a public employee will do so regardless of the procedural hurdles that are placed in its path. Denigration of fundamental constitutional law is the wrong pathway to take when it deprives a public employee of due process, one of the most cherished of rights granted him two hundred years ago–the right to life, liberty and property as well as

equal protection under the law. Summary denial of wages could, as a practical matter, drive such a wage—earning family to the wall. Done arbitrarily or capriciously it becomes a symbol of injustice that rankles the spirit of fair play.

Summary procedures can be devised that would provide fair and adequate methods to resolve the problem. This is essential because justice delayed may well be justice denied. Notice and hearing are commonplace in all administrative proceedings. Experience teaches that procedural safeguards often prevent erroneous decisions on the merits. It also teaches that government conduct is likely to be more cautious, careful and correct whenever it has to justify its decisions with sound reasons.

New Mexico must avoid the criss—cross position taken by the Supreme Court of the United States. Once again, I quote from Justice Chitty:

"Courts of justice ought not to be puzzled by such old scholastic questions as to when a horse's tail begins and where it ceases. You are obligated to say: 'This is the horse's tail' at some time."

*Howell v. Burk*, 90 N.M. 688, 699, 568 P.2d 214 (Ct.App. 1977), Sutin, J., dissenting.

I say: "This is the horse's tail." The due process clause, when applied to discharge of public employees, requires adequate and timely notice of discharge, the reasons therefore, and a hearing in a summary procedure that protects his rights of continued employment. For a proposal of an adequate administrative proceeding, see 50 N.Y.U.L.Rev. 358, *supra*.