Van Vorst, J.
Two defenses are interposed to the .mortgage, sought to be foreclosed in this action. The first, that when the mortgage was made the mortgagor was of unsound mind, and incapable of the management of her affairs. The second, that the money was raised on the mortgage at a usurious rate of interest, and that the mortgage is void.
The plaintiff is the assignee of the mortgage. The findings of the jury, in the proceedings instituted in the court of common pleas to inquire into the mental condition of the mortgagor that she was of unsound mind and incapable of managing her affairs, are not conclusive upon this plaintiff, who was not a party to the proceeding.
At most the inquisition is only prima facie evidence of such mental incapacity (Banker v. Banker, 63 N. Y. 409), and may be overcome. Considerable evidence was taken before me on the trial. The medical *276 experts were opposed in opinion, and of the other witnesses called, their evidence is in conflict.
One of the physicians testified that Mrs. Hanrahan, the mortgagor, had had a rupture of a blood vessel of' the brain, followed by partial paralysis. There was no-trouble with the spinal cord. Her mind was to some-extent weakened. In cases of cerebral hemorrhage, there" is always impairment of the intellect. The-patient is never as good as before. That although her mind was to some extent weakened, it was not more so-than is frequently the case in such instances, and she was not thereby rendered incapable of managing her property.
There was some evidence of emotional weakness, such as laughing and shedding tears without apparent cause, but emotional weakness may be co-existent with a fair degree of intelligence for the transaction of the-ordinary affairs of life. There was evidence at times of a want of memory, of sleeplessness and illusions, but they were temporary.
She did conduct her affairs; and there is no satisfactory evidence of mismanagement. Upon the execution of the commission she was present and underwent, a long examination. There is no evidence of delusions, nor of any great failure of memory. Her answers were in the main intelligent. On the second day she corrected some of her testimony given on the previous, day. It is evident that the examination in the end became burdensome to her. .
A careful consideration of the whole evidence satisfies me that the mortgagor, although weak in body and feeble in mind, was not devoid of reason and judgment; she had fair memory.
She was not in my judgment of “unsound mind" in the legal acceptation of that term (Stanton v. Wetherax, 16 Barb. 262; Blanchard v. Nestle, infra). *277 And although it was well that she should be relieved, for her health and comfort, from the charge of her business, I cannot say that she was legally incompetent for the management of her affairs.
She made a will, or codicil thereto, during this time, which has been admitted to probate.
With regard to the mortgage in question, I am fully persuaded that Mrs. Hanrahan comprehended its import, and intentionally, and understandingly executed it, to raise funds to pay interest on mortgages on her property, with other claims against her, and also to •enable her to give her daughter, the defendant, Mrs. Trainer, one thousand dollars. She had come from Texas at her mother’s request.
A mortgage made by a person in such condition of mind and for such purposes is not void. A lunatic, ■even before inquest found, is not absolutely disqualified from making a mortgage. The mortgagor was not a lunatic. A court does not distinguish between different degrees of intelligence.
It does not deny to a man of very feeble intellect the fight to make contracts and manage his affairs. To justify that, there must be a total want of understanding (Blanchard v. Nestle, 3 Denio, 37; Osterhout v. Shoemaker, note to same case).
And when the estates of persons of unsound mind have been benefitted, they will be held liable on their •contracts (Hicks v. Marshall, 8 Hun, 327).
I am of opinion that there is nothing in the use of the moneys raised by the mortgage, which should defeat this action. They were applied to the purposes above indicated, entirely proper in themselves.
The defense of usury interposed renders it necessary to inquire further in regard to the making of the mortgage and its negotiation.
The mortgage was made to raise money for Mrs. *278 Hanrahan, to be applied by her to the uses above indicated. The mortgagee, Trainer, was her son-in-law. He paid nothing for the mortgage. He, as well as the mortgagor, fully understood the purpose for which the mortgage was made. It was discussed between them, as it was between her and her physician, Dr. Eanney.
Before the mortgage, which was a second or third one, was offered for sale, and to give it an appearance of validity, it was duly recorded. In this condition it was offered by Trainer, through a broker, for sale. The broker offered it to the plaintiff through his attorney. Trainer stated to the plaintiff’s attorney and agent, who had the charge of the business, that he had given $3,000 for the mortgage. This was the full ' amount.
The plaintiff’s attorney required an affidavit from the mortgagor that the mortgage was á valid security and made upon upon a legal consideration.
The affidavit was made and furnished to the plaintiff’ s attorney. The commissioner' who administered the oath, says it was read to her in his presence, before the affidavit was made. He saw nothing unusual in her manner or action. He had conversation with her at the time. He had known her for some years.
The amount paid by the plaintiff for the mortgage was $2,700, of which $2,400 reached the mortgagor. The. residue was paid by Trainer for brokers’ fees, insurance, attorneys’ fees,, &c., &c. There is nothing to impeach the entire good faith of the plaintiff in this transaction. He personally had nothing to do with the business. His attention was called to the purchase of the mortgage by his attorney. • He was advised it was a valid mortgage, and left the details to his lawyer, and at the close of the examination of the title, paid $2,700.
There is nothing in the evidence from which it can *279 be inferred that either the plaintiff or his attorney knew anything of the purpose for which the mortgage was made, or of any invalidity therein. Had any such fact existed the plaintiff could not recover (Real Estate Trust Co. v. Seagreave, 49 How. Pr. 489). The attorney made such inquiries at the time as he thought proper and reasonable. He inquired of Trainer, of the commissioner who administered the affidavit, and he had the affidavit itself before him. There seemed nothing to excite a suspicion that the mortgage was not such as it was solemnly represented to be. I cannot say that the attorney did not exercise care and reasonable diligence.
Neither the plaintiff nor his attorney knew Mrs. Hanrahan, or had seen her before the assignment of the mortgage was made, and the money paid.
In the scheme projected by the mortgagor and her son-in-law to raise money, through a mortgage made for the purpose, the plaintiff had no part. He, through his attorney, acted exclusively upon the representations of. Trainer, the statements contained in the affidavit, and what he learned from the commissioner.
I think the defendants, the legal representatives, hens, devisees and legatees of the mortgagor, are concluded by her affidavit. •
The validity of such affidavit as an estoppel has been frequently upheld (Payne v. Burnham, 62 N. Y. 73).
I do not think that the condition of the mortgagor at the time as to bodily and mental health, of which the plaintiff and his attorney were wholly ignorant, can defeat the estoppel.
The affidavit was made to secure the negotiation of the mortgage, and it performed its work. It would be unjust in the extreme to throw the loss upon a person who acted innocently, and in good faith relied upon *280 the representations, and knew nothing to the contrary of their truthfulness.
It was the plan of the mortgagor in connection with her son-in-law, to make the mortgage, and raise money in the manner above stated. If she had capacity to understand and execute the transaction, which it appears she had—she acted under no compulsion, but voluntarily, and with a purpose—her estate must be 'concluded by the affidavit; and for the purpose of this action, and to prevent injury to the innocent, the mortgage must be held such as it was represented to be.
There must be judgment for the plaintiff, but under the case of Payne v. Burnham, supra, he can only recover the amount received by Mrs. Hanrahan on the mortgage.*
*282 The following cases illustrate the recent rulings on the effect of an inquisition:
After the indorser of a draft had been found, upon inquisition, incapable of managing his affairs, by reason of habitual drunkenness, he waived demand and notice of dishonor;—Held, that the inquisition was conclusive evidence of his incompetency, from the time it was found, to make such waiver, even though the holder had no-notice of the inquisition at the time of taking the waiver. The *283 cases holding inquisitions of lunacy not conclusive evidence of the lunatic’s incapacity to contract, all relate either to acts or contracts done or made before the finding, or to the making of a will. Wadsworth v. Sharpsteen, 8 N. Y. (4 Seld.) 388, affi’g Wadsworth v. Sherman, 14 Barb. 169.
An inquisition under a writ de lunatico inguirendo, finding that during a period including the time of the execution of a deed the grantor was non compos mentis, is presumptive but not conclusive evidence of the grantor’s incapacity, when interposed in an action wherein a party claims under the deed. Van Deusen v. Sweet, 51 N. Y. 378.
The inquisition is only presumptive evidence of incapacity at any time prior to the finding, although retrospectively included in it. These proceedings have been likened to proceedings in rein, which are conclusive on all the world, and all are bound to take notice of them. Actual notice is not necessary, and whether given or not is not material. The inquisition is conclusive against subsequent acts and dealings, and presumptive against prior ones. This is the rule, and is applicable irrespective of notice. It has been held that the inquisition .is only presumptive evidence of incapacity as to some acts done subsequently ; this has been held as to making a will. [Citing 50 Barb. 615.] Banker v. Banker, 63 N. Y. 409.
An inquisition finding lunacy to have existed for a specified period, with lucid intervals, is competent, though only prima facie evidence that a transaction had during that period is void, and throws the burden on the other party to show that it was had in a lucid interval. Goodell v. Harrington, 3 Supreme Ct. (T. & C.) 345.
In an action on a bond dated Dec., 1827, an inquest under a commission of lunacy, taken Feb., 1828, finding defendant to have been incapable, &c., since June, 1827,—Held, admissible (though not conclusive), to sustain the defense of lunacy. Hart v. Deamer, 6 Wend. 497.
That an inquisition of lunacy, if properly taken, is but presumptive proof against persons not parties or privies, and does not relate back, unless so expressed,—See Rippy v. Gant, 4 Ired. (N. C.) Eq. 443.
The effect of the finding of the inquisition in lunacy, &c., is prima facie, and on the trial of the traverse throws the burden of disproof on the respondent. McGinnis v. Commonwealth, 74 Pa. St. 245; See also, Lancaster Co. Bank v. Moore, 78 Id. 407.
The fact of insanity having been judicially ascertained, the law presumes its continuance until a restoration to sanity or a lucid interval is established. A discharge from the lunatic asylum, because the officers adjudged the patient restored, would be at least prima fame *284 evidence of such restoration. Haynes v. Swann, 6 Heisk. (Tenn.) 560.
An inquisition of lunacy, finding that a party is by reason of lunacy incapable of managing his estate, and had been so for a time specified, is prima facie evidence of incompetency to contract within said time, though liable to be rebutted by testimony. . So held, although the adverse party had no notice. Noel v. Karper, 53 Penn. St. 97.
The selectmen of a town, being authorized by statute to adjudicate on the subject of insanity, and to give a certificate of such adjudication, and of the residence of the insane person to be sent to the insane hospital, and being required to record the same, a copy of such certificate is admissible evidence in the action of the town against another town. Eastport v. East Machias, 35 Maine (5 Redf.) 402.
Under the statutes relative to the State lunatic asylum, a certificate given by a county judge for the commitment of a person to the asylum as an insane pauper, is not conclusive evidence of the matters therein recited, as against a person who was not notified of the hearing and investigation. Hence, where a wife is committed by such a certificate, without notice to her husband, it is competent for the husband, when sued for her expenses, to prove that the county judge had no jurisdiction, and that the lunatic had not become insane within the provision of the statute. Supervisors of Monroe County v. Budlong, 51 Barb. 493.
An inquisition that one is a lunatic with lucid intervals, leaves third persons free to prove that the act set up by them was done in a lucid interval, Hall v. Warren, 9 Ves. 605; S. C., Ewell’s Cases, 701.
A decree of a probate court, dismissing a petition for the appointment of a guardian of an alleged insane person, and the verdict of a jury and judgment of the court on appeal, are not conclusive evidence of his sanity at a time intermediate between such verdict and judgment, in an action subsequently brought to recover land of which he made a deed between those dates. Gibson v. Soper, 6 Gray, 279.

 The following recent cases, and the cases which the reader will ¡find cited in them, will afford a convenient clue to the conflict in modern decisions in other States, upon the validity of the civil acts •of insane persons. The civil acts of a lunatic before office found, are not void, but at most voidable in a proper case. A lunatic is not ab soluteiy disqualified from making a contract. Ingraham v. Baldwin 9 N. Y. 45, affi’g 13 Barb. 9; Loomis v. Spencer, 2 Paige, 153. And a conveyance should not be set aside where the consideration was fair and no advantage was taken; and if the consideration was the assuming a risk, the ultimate result of the bargain is not a test of its adequacy. Sprague v. Duel, 11 Paige, 480.
A plumber attended an auction sale of materials and bought largely. The seller heard that he was said to be out of his mind, and told the auctioneer, who spoke of it to the plumber, who was enraged and threatened an action, and was thereupon allowed to go on bidding. He paid part of the price of his purchases and gave notes and war rant to confess judgment for the rest. Shortly after, he was found by inquisition to have been insane throughout, without lucid intervals. Held, that the inquisition was not conclusive; but if it were, it did not appear that the seller acted in bad faith, and equity would not interfere at suit of the committee to set aside the sale and cancel the securities. Niell v. Morley, 9 Ves. 478.
A lunatic incapable of managing his affairs applied to a life i asur *281 ¡anee company for an annuity, and they, without notice of his incapacity, and in the ordinary course of business received his money (£355, 6 s. 2 d.), and promised to pay him an annuity for life. He died shortly after, and the company were never called on to pay anything. Held, that his representative could not recover back the sums paid by him. Molton v. Camroux, 4 Exch. 17, affi’g 2 Id. 487; S. C., Ewell’s Cases, 614.
Where the representative of the deceased .lunatic sued the lunatic’s vendee, in trover, for goods sold, and the question was whether a delivery by agent, made after supervening insanity of the principal, but pursuant to a previous verbal contract (made when he was competent, but which was void under the statute of frauds), was an effectual delivery,—Held, that the proper instruction for the jury was that the contracts of the insane are invalid, with the qualification that if the buyer was dealing with him or his agent in the ordinary course of business in good faith, and, without any knowledge of the unsoundness, and, without knowledge of such circumstances as would put a reasonably prudent man upon inquiry, made the bargain in good faith, then that would be a good bargain. But it was not error to refuse to charge that nothing but imposition on an insane person will avoid his contract. The modern rule is that except in case of necessaries, where imposition must be shown to constitute a defense, absence of knowledge of insanity, as well as fairness, must be shown to sustain the contract. Mathiessen, &c. Co. v. McMahon, 38 N. J. L. 537, 543.
As to powers, compare with this case Dexter v. Hall, 15 Wall. 9; Wallis v. Manhattan Co., 2 Hall, 495.
An innkeeper who was an imbecile, and wholly incapable of making a contract, owned, and, by his agents, carried on, a hotel and bar; and plaintiffs, in ignorance of his insanity, sold liquors to him for supplying his bar. Held, that this was an executed contract, and the •sellers could recover the price.
The rule both on principle and authority' is that where a person apparently of sound mind and not known to be otherwise, and "who has not been found to be otherwise by proper proceedings for that purpose, fairly and bona fide purchases property and receives and uses the same, whereby the contract of purchase becomes so far executed that the parties cannot be placed in statu quo, such contract cannot afterward be set aside, or payment for the goods be refused either by the alleged lunatic or his representatives. Wilder v. Weakley, 34 Ind. 182.
A purely executory contract—e. g., a promissory note given as a *282 voluntary subscription to a college endowment—may be avoided by the maker showing that he was of unsound mind when he made it; and the fact that the contracting party took it in good faith and has acted on it, does not estop the maker from setting up this defense. Otherwise of an executed contract. Musselman v. Cravens, 47 Ind. 1, ind cases cited.
The owner of oxen put them into the care of an insane person knowing him to be insane, and the latter, while insane, killed them. Held, that the owner could recover against him as a bailee. The bailor’s knowledge that the bailee is insane when receiving the property does not necessarily preclude his recovering in such a case; although the circumstances might be such as to amount to a license or consent to what would otherwise be wrongful. Morse v. Crawford, 17 Vt. 499; S. C., Ewell's Cases, 635.
An aged person of unsound mind, having a life estate in a farm, and owning stock and property thereon, valued at nearly $500, made a contract with plaintiff by which she conveyed to him the farm for her life, and the personal property absolutely, in consideration that he should support her for life. She lived about thirteen weeks; and the value of board was from $3.50 to $3.50 per week, making less than $50; held, that the contract was valid in the absence of affirmative evidence showing fraud, undue advantage or imposition, or that defendant had actual knowledge of her insanity. And, having been executed, it was a case where the parties could not be restored in statu quo, and defendant was not liable to the executor, either for the use of the premises or the value of the personal property. Young v. Stevens, 48 N. H. 133.
In Boynton v. Knight, Law Reports, 3 P. & D. 64, it is said that if any distinction in degrees of mental capacity can be recognized the highest degree is requisite for testamentary capacity. Sir J. Hannen.
In Converse v. Converse, 21 Vt. 168; S. C., Ewell's Cases, 652, Redfield, J., expresses the contrary opinion, that less mental capacity suffices to make a will than a contract.